U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2017 APR 10 PM 4: 06

CLERK

BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

SHAWN FLYNN, )
)
Plaintiff, )
)
v. ) Case No. 2:16-cv-150
)
NANCY A. BERRYHILL, )
Acting Commissioner of Social Security, )
)
Defendant. )

## OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR AN ORDER REVERSING THE COMMISSIONER'S DECISION AND GRANTING THE COMMISSIONER'S MOTION TO AFFIRM
(Docs. 8 & 11)

Plaintiff Shawn Flynn is a claimant for Social Security Disability Insurance

("SSDI") benefits under the Social Security Act. He brings this action pursuant to 42

U.S.C. § 405(g) to reverse the decision of the Social Security Commissioner that he is not

disabled.[1] On November 7, 2016, Plaintiff filed his motion to reverse, seeking a remand

for an order of benefits (Doc. 8). On January 4, 2017, the Commissioner moved to affirm

(Doc. 11). On January 19, 2017, the court took the pending motions under advisement.

Plaintiff identifies the following errors in the Commissioner's decision: (1)

Administrative Law Judge ("ALJ") Matthew Levin failed to adhere to the treating

physician rule in evaluating the opinions of Plaintiff's treatment providers; (2) the ALJ

---

[1] Disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant's "physical or mental impairment or impairments" must be "of such severity" that the claimant is not only unable to do any previous work but cannot, considering the claimant's age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

improperly evaluated Plaintiff's alcohol use; and (3) the ALJ's credibility determination was not supported by substantial evidence.

James Torrisi, Esq. represents Plaintiff. Special Assistant United States Attorney Rebecca H. Estelle represents the Commissioner.

## I. Procedural History.

Plaintiff applied for SSDI benefits on January 31, 2007, alleging a disability onset date of October 31, 2006. The Commissioner initially denied Plaintiff's claims on June 15, 2007, and, upon reconsideration, on July 9, 2008. Plaintiff thereafter filed a timely written request for a hearing before an ALJ. Following an August 5, 2009 hearing at which Plaintiff testified, ALJ Thomas Merrill issued an unfavorable decision on August 20, 2009, which the Decision Review Board remanded on November 23, 2009.

ALJ Merrill held a second hearing on October 15, 2010 at which Plaintiff, impartial medical expert Alfred Jonas, M.D., and vocational expert ("VE") Richard Paul testified. On October 29, 2010, ALJ Merrill again issued an unfavorable decision. Plaintiff appealed that decision to this court, which on December 23, 2011, granted the Commissioner's motion for remand and ordered that a newly-assigned ALJ further develop the record and issue a new decision.

On April 4, 2013, ALJ Levin held a video hearing at which Plaintiff and VE Christine Spaulding testified. On April 9, 2013, he issued an unfavorable decision to which Plaintiff filed a timely written exception. Thereafter, the Appeals Council remanded the case to ALJ Levin with the following instructions:

> [D]etermine whether the claimant engaged in substantial gainful activity, further consider the claimant's severe impairments, obtain additional evidence, further evaluat[e] the claimant's mental impairments, further consider the claimant's maximum residual functional capacity, obtain supplemental evidence from a vocational expert if warranted, and obtain evidence from a new medical expert[.]

(AR 1268.)

On January 7, 2016, ALJ Levin held a fourth hearing at which Plaintiff, impartial medical expert John R. Ruggiano, M.D., and VE Elizabeth C. LaFlamme testified. In a

2

decision dated February 18, 2016, ALJ Levin found that Plaintiff did not establish that he was disabled within the meaning of the Social Security Act, and thus was not entitled to SSDI benefits. Plaintiff did not file exceptions with the Appeals Council within sixty days of the Notice of Decision. As a result, ALJ Levin's February 18, 2016 decision stands as the Commissioner's final decision.

## II.    Factual Background.

Plaintiff is a male with a high school education born in 1966. He worked for approximately eighteen months during 2011-12 as a cook, and prior to that period, last worked on October 15, 2006 in that same occupation. All of Plaintiff's prior work experience is in the culinary field. Plaintiff alleges he is disabled on the basis of bipolar disorder.

### A.    Plaintiff's Mental Health.

According to his February 16, 2007 treatment notes, Plaintiff's primary care physician Robert Wood, M.D. "agree[d] with disability on psychiatric basis" after he had treated Plaintiff for approximately eight months. (AR 283.) Plaintiff was prescribed Lexapro which he did not find effective. With Dr. Wood's support, he then sought counseling.

Beginning on July 13, 2006, Plaintiff engaged in counseling with psychiatric nurse William R. Cote, A.P.R.N. on a regular basis. In a November 17, 2007 letter to Plaintiff, Mr. Cote stated that he did "not believe that [Plaintiff is] able to work or to pursue a training program at this time nor [is Plaintiff] able to engage in a training program" and that he expected this condition to last "indefinitely." (AR 460.) Mr. Cote recorded that Plaintiff had a primary diagnosis of bipolar disorder and a secondary diagnosis of alcohol dependence, in partial remission. Mr. Cote characterized Plaintiff's prognosis as "guarded" and stated that "the medications are helpful in controlling the most troublesome symptoms but there is no known cure for this condition." (AR 458-59.) Mr. Cote rendered substantially the same opinions regarding Plaintiff's ability to pursue employment on September 4, 2008, July 29, 2009, and October 29, 2009. In his July 29,

3

2009 opinion, Mr. Cote stated that Plaintiff had "abstained from alcohol as far as I know for many months." (AR 453.)

In addition to Mr. Cote's mental health treatment, from August 1, 2006 through March 31, 2011, Plaintiff engaged in counseling with Gretchen Lewis, L.C.M.H.C., a licensed psychotherapist. On August 15, 2006, Ms. Lewis noted that Plaintiff's alcohol use "border[ed] on abusive at times" (AR 289). She documented several instances of outbursts of anger by Plaintiff and noted that she was working with Plaintiff to improve his coping skills. On May 9, 2007, Ms. Lewis recorded that Plaintiff had been doing a lot of work on his house.

On April 7, 2008, Ms. Lewis opined that Plaintiff's diagnosis, "made in conjunction with Bill Cote, Psych. N.P.[,]" was bipolar disorder (AR 455), which caused "marked" limitation in social functioning and ability to maintain concentration, persistence or pace, and "moderate" restrictions in his activities of daily living. (AR 456.) Ms. Lewis opined that Plaintiff had experienced one or two episodes of decompensation.

On July 10, 2009, Ms. Lewis completed an Assessment of Ability to Do Work-Related Activities (Mental) ("Mental Assessment"), determining that Plaintiff had "marked" difficulties in relating to co-workers, dealing with the public, interacting with supervisors, coping with work stresses, and maintaining attention and concentration. She observed that Plaintiff "continues to spend the majority of his time at home due to the fact that he finds himself easily dysregulated and frustrated despite ongoing medication management and counseling." (AR 450.) Ms. Lewis concluded that Plaintiff "has a low tolerance for making any kind of mistake and will usually sabotage a whole project over something like this." (AR 451.) She opined that Plaintiff was "still emotionally unstable and unpredictable in social situations, but has made progress in terms of decreasing the intensity of his emotional upheavals." *Id.* She further assessed that Plaintiff would be expected to miss at least four work days per month due to his mental impairments, depending on "what kind of mood he will be in on any given day and his mood continues to fluctuate regularly in a month's period." (AR 452.) Ms. Lewis responded "NA" in

4

response to a question regarding Plaintiff's alcohol use. *Id.* Overall, Ms. Lewis determined that Plaintiff was "quite a ways off from where we would like to see his baseline functioning." (AR 449.)

On October 26, 2009, Ms. Lewis recorded that Plaintiff had a "rough month" (AR 526) as both his grandmother and grandfather had passed away within a ten-day period. The next month, Ms. Lewis noted that Plaintiff "has really been enjoying work on projects in his wood shop" (AR 527) and on January 19, 2010 stated that Plaintiff "seems to be doing really well" with "less expansive" moods (AR 528).

On April 7, 2010, Dr. Wood recorded that Plaintiff "[a]dmit[ted] to drinking at least 2 beers daily" (AR 463) and reported that his depression had grown significantly worse. Dr. Wood recommended "acute intervention . . . either through the [N]ortheast [K]ingdom mental-health or through the Emergency Ward[.]" (AR 464.) The next day, Plaintiff was brought to the Northeast Kingdom Human Services Care Bed (the "Care Bed") where he reported to the attending physician: "I thought I was doing alright but then I tried to slit my wrists because I don't want to see tomorrow or any tomorrow." (AR 492.)

Thereafter, Plaintiff received treatment from psychiatrist Richard Edelstein, M.D., who completed a psychiatric evaluation of Plaintiff on May 19 and June 8, 2010. Dr. Edelstein noted that Plaintiff's chief complaint was that "[l]ife sucks" and that Plaintiff "fe[lt] like there is a cloud over him, fe[lt] cut off from the world" and "tend[ed] to isolate self, and feel[] anxious, especially in crowds." (AR 1049.) Dr. Edelstein pointed to Plaintiff's history of alcohol abuse, including that two months prior, he drank "a case of beer per night for a period of 3 weeks prior to admission to Care Bed" but since that time, he had only consumed three beers. (AR 1050.) Dr. Edelstein's mental status examination revealed that Plaintiff was "pleasant, friendly, calm, and cooperative. Affect is in full range. Mood is neutral. Speech is coherent. Thought content is without distortions of reality testing. No acute suicidal ideation." (AR 1051.) On August 20, 2010, Dr. Edelstein recorded that Plaintiff reported having "a rough time a few nights ago and scratched his wrist several times 'as practice.'" (AR 1044.) Dr. Edelstein assessed

5

that Plaintiff was "[m]ildly anxious . . ., not grossly depressed, some joking, no acute S[uicidal] I[deation]." *Id.*

In a September 21, 2010 Questionnaire, Dr. Edelstein diagnosed Plaintiff with bipolar disorder and found "moderate" restrictions in Plaintiff's activities of daily living and "marked" difficulties in his ability to maintain social functioning and concentration, persistence or pace. (AR 504.) That same day, Dr. Edelstein also completed a Mental Assessment and opined that Plaintiff had "extreme" difficulties dealing with the public; "marked" difficulties responding appropriately to usual work situations, to changes in routine work settings, and in maintaining concentration; "moderate" difficulties responding appropriately to co-workers, dealing with work stresses, and functioning independently; and "slight" difficulty responding appropriately to supervision. (AR 506.) He opined that Plaintiff would be expected to miss at least two days of work per month due to his impairments which he characterized as "ongoing and chronic." (AR 508.) Regarding whether Plaintiff's alcohol use contributed to his limitations, Dr. Edelstein responded: "NA currently." *Id.*

In an October 10, 2010 Mental Assessment, Ms. Lewis observed that Plaintiff had a "[d]epressed mood most of the day [and] markedly diminished interest or pleasure in almost all activities." (AR 517.) She noted that Plaintiff exhibited "marked" difficulties in his ability to deal with work-related stress and to respond appropriately to usual work situations, supervision, co-workers, and changes in a routine work setting. *Id.* She further opined that Plaintiff suffered from a "[d]epressed mood . . ., feelings of worthlessness or excessive guilt[.]" (AR 518.) She reiterated her assessment that Plaintiff would be expected to miss several days of work per month due to his mental impairments and did "not believe that [Plaintiff] would be able to maintain 8 hrs/day – 40 hrs/week without decompensating or having some sort of mishap at work occur." (AR 519.) Regarding the relationship between Plaintiff's alcohol use and these limitations, Ms. Lewis stated that Plaintiff "may have used alcohol to try to control his illness, [but] now that we have medication on board, this is no longer an issue." *Id.*

After Plaintiff's SSDI application was denied in the fall of 2010, he resumed work as a part-time cook, and then began working nearly full-time in April 2011. He continued to work as a cook until November 2012 and earned approximately $25,000 during an eighteen-month period in that position. On August 4, 2011, Dr. Edelstein noted that Plaintiff had become "overly busy[,] working a lot of hours, trying to keep up with a very large garden" and that "[o]verall, [his] mood has been good[.]" (AR 1035.) On September 1, 2011, Dr. Edelstein recorded that Plaintiff was "working long hours (35 hrs/week)" but reported no new stressors. (AR 1034.)

Although Plaintiff had already been working nearly full-time, Dr. Edelstein opined on September 22, 2011 that Plaintiff "is ready to return to work up to but no more than four days a week." (AR 1033.) From October 27, 2011 to November 8, 2012, Dr. Edelstein recorded that Plaintiff was either working part-time or nearly full-time at various restaurants and handling both his work schedule and illness well, with only mild variations in his mood.

On November 26, 2012, Plaintiff sought treatment at the North Country Hospital, stating that he "took between 75-100 tylenol yesterday (500 mg)." (AR 1209.) Plaintiff's admission record states that he attempted suicide, but recorded that he "[a]ppears in no apparent distress." (AR 1188.) Plaintiff was then transported to Dartmouth-Hitchcock for further treatment and observation. According to the November 27, 2012 treatment notes of psychiatrist Frances S. Shin, M.D., Plaintiff was regretful about his actions and "endorse[d] suicidal ideation for the past week and continues to feel like he wants to 'just end it.'" (AR 1073.) Dr. Shin recorded a prior suicide attempt two and a half years prior in which Plaintiff slit his wrist in a manner that did not require sutures. Dr. Shin further documented that Plaintiff endorsed "depressive symptoms (sadness, hopelessness, anhedonia, poor energy, poor concentration . . . poor sleep) for the past month" and that Plaintiff "drank 3-4 beers on night prior to admission (11/25)[.]" (AR 1073-74.)

During this same time period, Plaintiff was seen by psychiatrist Donald A. West, M.D., who opined that electroconvulsive therapy ("ECT") "may be the best option

considering [Plaintiff's] history." (AR 1079.) Thereafter, Plaintiff underwent multiple rounds of ECT and was discharged on December 18, 2012. The discharge summary completed by Hee-Jun Ahn, M.D. and Dr. West stated that "[o]n the day of discharge, the patient denied thoughts of suicide, homicide, or violence. Given patient's positive and notable response to ECT in terms of depression compared to admission, outpatient maintenance ECT was not deemed necessary at this point[.]" (AR 1084.) The summary also noted that "it may be beneficial for patient to take a short leave from work until he could effectively manage the stress[.]" *Id.*

In a December 19, 2012 letter to Attorney Torrisi, Dr. Edelstein stated that he had not changed his opinion regarding Plaintiff's disability since September 21, 2010, but because Plaintiff had been hospitalized since his last contact with him on November 8, 2012, his opinion "may change to some extent" after an opportunity to treat Plaintiff further and review his inpatient records from Dartmouth-Hitchcock. (AR 1062.) After reviewing those records, on March 20, 2013, Dr. Edelstein updated his opinion as follows:

[Plaintiff's] depression is a disabling condition. I can attest to the fact that he has tried to work at a variety of chef/cooking jobs over the past few years. He has experienced an upsurge in anxiety and depressive symptoms in each position. He worked at his latest position for months, continuing even as some of his symptoms worsened. Ultimately, he became suicidal and after a suicide attempt was hospitalized, where he was treated with electro-convulsive therapy. I believe that the stress of his work contributed to his depression. He is better now than when hospitalized, but still too anxious and down to return to the job. I do not recommend that he return to employment at this time.

(AR 1201.)

Throughout 2014, Dr. Edelstein continued to record Plaintiff's depressed mood, but noted that his speech was coherent and logical and his memory, concentration and judgment were intact. On July 29, 2014, Dr. Edelstein observed that Plaintiff "report[ed] better energy, motivation, and increased activity, but still gets down at times, and even had a recent vague SI, without plans." (AR 1231.) Dr. Edelstein recorded that Plaintiff

8

had gone camping with family that month and was planning to go kayaking with his niece the following day.

By September of 2014, Dr. Edelstein detected "fidgetiness" in Plaintiff's demeanor but also noted a "euthymic" mood and normal speech, memory and concentration. (AR 1235.) On November 5, 2014, Plaintiff recounted to Dr. Edelstein that he engaged in several "shouting matches with wife and strangers, got drunk and drove around the woods for several hours, then went to the ER when he told his wife he was suicidal." (AR 1237.) Plaintiff appeared "mildly anxious" with "sometimes impaired" judgment, but had normal mood, affect, speech, memory, and concentration. (AR 1238.)

In the spring and summer of 2015, Dr. Edelstein recorded that Plaintiff continued to have a depressed mood with irritability but no suicidal ideation. During the same time period, Plaintiff exhibited normal speech, memory, and concentration. In several 2015 treatment notes, Dr. Edelstein diagnosed Plaintiff with "EtOH dependence, in current remission." (AR 1242, 1247, 1257.)

In a December 28, 2015 letter to Attorney Torrisi, Dr. Edelstein stated that his opinion "ha[d] not changed since" his September 21, 2010 and March 20, 2013 opinions. (AR 1264.) He further stated that Plaintiff is "disabled due to his mood disorder and anxiety. Regarding the contribution, if any, of alcohol abuse to his disability, it is my opinion that alcohol has been associated with a few, but by no means all, of his episodes of severe illness. I do not regard alcohol as a primary causative factor in his illness." *Id.*

## B. State Consultants' Assessments.

### 1. Dr. Schwartzreich's June 2007 RFC Assessment.

On June 13, 2007, State Agency Medical Consultant Edward Schwartzreich, M.D. opined that Plaintiff had a medically determinable impairment of bipolar affective disorder that caused "moderate" difficulties in maintaining concentration, persistence, or pace, and "mild" restriction in activities of daily living and difficulties in maintaining social functioning. (AR 321.) He did not personally examine Plaintiff.

9

On the same date, Dr. Schwartzreich rendered a Mental Residual Functional Capacity ("RFC") Assessment in which he opined that Plaintiff had "moderately limited" abilities to carry out detailed instructions, to maintain attention and concentration for extended periods, to complete a normal workday without interruptions from psychologically based symptoms, and to respond appropriately to changes in the work setting, but was otherwise "not significantly limited." (AR 325-26.) Dr. Schwartzreich observed that Plaintiff was "able to do self-care, chores, meal prep, driving, shopping, handling money" and opined that Plaintiff would be "[a]ble to sustain 1-4 step tasks for 2-hr periods over an 8-hr workday, across a 40-hr workweek. . . . He requires a quiet workplace with straightforward, predictable tasks and adequate supervision" and "can ha[n]dle the routine social demands of a workplace." (AR 327.) Dr. Schwartzreich cautioned that Plaintiff "should avoid work stressors" but was nevertheless "able to appreciate safety issues, travel in public, and show good judgment." *Id.*

## 2. Dr. Jonas's Testimony at the October 15, 2010 Hearing.

At the October 15, 2010 hearing before ALJ Merrill, Dr. Jonas, a board certified psychiatrist, testified as an impartial expert who had not examined Plaintiff. Based on his review of Plaintiff's medical records, he opined that there was "no genuine support for" the diagnosis of bipolar disorder. (AR 568.) Dr. Jonas acknowledged that "[t]here is a kind of an aspect of instability" and "a tenuousness of relating" in Plaintiff's behavior. *Id.* However, nothing in the record "actually references or reflects an impairment in A[ctivities of] D[aily] L[iving]." (AR 569.) He pointed to Plaintiff's prior status as a stay-at-home parent as evidence that Plaintiff could engage in the activities of daily living. Dr. Jonas stated that the record supported a finding that Plaintiff had moderate limitations in social functioning, and questioned Dr. Edelstein's finding that Plaintiff had marked restrictions, but was not sure that he would "completely disagree" with that opinion. (AR 570.)

Dr. Jonas also questioned Dr. Edelstein's and Ms. Lewis's opinions that Plaintiff had "marked" limitations in maintaining concentration, persistence and pace, noting that in Dr. Edelstein's mental examinations from May and June 2010, Plaintiff was found to

have normal concentration and could manage his personal finances. Dr. Jonas concluded that "my sense is that in reality there is no impairment." *Id.* Dr. Jonas nonetheless acknowledged that Dr. Edelstein opined that Plaintiff satisfied the criteria for bipolar disorder.

With regard to treating opinions that indicate that Plaintiff suffers from bipolar disorder, Dr. Jonas testified as follows:

> [T]he record reflects that Ms. Lewis says that he's bipolar because Mr. Co[te] says he's bipolar. And then, we have Dr. Wood says that he's felt to have probable bipolar in discussions with, apparently, Mr. Co[te] and Ms. Lewis. . . . [F]or whatever collection of reasons that will take a long time for us to talk about, bipolar disorder is a dramatically over-applied diagnosis, which is to say that diagnosis occurs essentially rampantly, but the condition is fairly uncommon. . . . [B]ipolar is one or both of two things. Either it is depression, that's one pole, and the other is mania or hypomania. That's the other pole. Depression is a pretty familiar concept. People have a sense of what that means. It's a person who is moderately or deeply depressed. They look depressed. They act depressed. And, for purpose of this diagnosis, we're talking about something that is continuous for at least two weeks. This is not subtle, especially sometimes with bipolar disorder. And so that's one pole. The other pole, the hypomanic or manic, is somebody who is over-activated, and there are many complications of that. They don't sleep well. Their behavior is poorly controlled. They do things which they wouldn't normally do. They are indiscrimina[te] about various kinds of things. And again, that's something that will last for at least a few days. It is, again . . . pretty dramatic. I[t]'s not subtle. And, my purpose in mentioning this to you is that, for people who are genuinely bipolar, medical notes are very clear about the mania or the depression. They very clearly describe somebody who is manic and not easy at all to control or very depressed. . . . In this record, we don't have anything like that. We have some emotional instability . . . [b]ut, nothing like real mania or real depression. So, again, in terms of the general concept of bipolar disorder and thinking about Mr. Flynn in terms of how he's reflected in the medical records, he and bipolar disorder are just not the same thing at all.

(AR 573-75.)

### 3. Dr. Ruggiano's Testimony at the January 7, 2016 Hearing.

Dr. Ruggiano, an impartial, non-examining expert who is board certified by the American Board of Psychiatry and Neurology, testified before ALJ Levin at Plaintiff's

11

fourth disability hearing to address the following remand from the Appeals Council: "[C]larify the extent of the claimant's alcohol abuse, as it was not consistent throughout the relevant period, and to re-assess whether it is material to the determination." (AR 1276.)

Regarding Plaintiff's bipolar disorder diagnosis, Dr. Ruggiano opined that:

you would expect at some time in the record there would be a period of mania, and then you'd expect in the record that it would be a period of depression. The depression should be markedly different from his usual state, which should be normal. In other words, bipolar people have a course of illness which is chronic and remitting. It remits sometimes, and that's not what's in this record.

(AR 613-14.) In light of Plaintiff's documented irritability, Dr. Ruggiano expected that a person with such symptoms had used alcohol, marijuana, or other narcotics which "take away frustration tolerance and make people irritable and not want to be bothered by other people, and that's what I see in these progress notes." (AR 614.) Dr. Ruggiano therefore "wonder[ed] if there's more alcohol being used than the patient is admitting to" but added that he did not suggest that Plaintiff was lying "because patients who have drug, alcohol, and narcotic problems . . . usually have their own truth." *Id.* The only impairment Dr. Ruggiano "ventured to make" was alcohol abuse (AR 615), and opined that Plaintiff's limitations in social functioning, which he characterized as moderate, were attributable to "central nervous system depressant chemicals" that could include "narcotics, sedative, alcohol, and marijuana." (AR 616.) Dr. Ruggiano admitted that "it's a difficult record to form opinions with reasonable certainty, and it usually is with alcohol abuse." (AR 613.) Dr. Ruggiano could not determine with reasonable certainty when, after the alleged onset date, Plaintiff resumed using alcohol.

Due to Plaintiff's suspected ongoing alcohol abuse, Dr. Ruggiano stated that Plaintiff would "do better" in a job "in which he didn't have to interact with people" but that there was "no evidence of cognitive impairment" and only moderate impairment in Plaintiff's ability to maintain concentration, persistence, or pace. (AR 619.) Dr. Ruggiano disagreed with Dr. Edelstein's December 2015 opinion that Plaintiff continued

to be disabled due to mood disorder and that alcohol was not the primary causative factor in Plaintiff's illness. He summarized his disagreement as follows: "I read these treating notes, and it makes me think there's an alcohol problem here, but I can't say with reasonable certainty because [Plaintiff is] denying it; therefore, I'm left wondering why he doesn't have frustration tolerance, and why he's so irritable, and why he doesn't get better." (AR 621-22.)

When asked by Attorney Torrisi whether ECT is reserved for severe and intractable psychiatric cases, Dr. Ruggiano stated that "it shouldn't be, but, yes, it is. That's how it is nowadays, they save it for cases that don't respond to medications. My personal opinion is that they ought to use it first because it works better and it's safer, but that's not the common feeling[.]" (AR 626.)

## C. Plaintiff's Testimony at the Hearings Before ALJ Merrill and ALJ Levin.

### 1. August 5, 2009 Hearing Before ALJ Merrill.

Plaintiff testified that he worked as a kitchen manager and cook from April 15, 2006 to October 15, 2006, and in those same roles at another restaurant establishment from August 2005 to March 2006. Prior to those time periods, Plaintiff was a self-employed restaurant manager from September 2004 to August 2005. At the time of the August 5, 2009 hearing, Plaintiff had amassed twenty-five years of prior work experience in the fields of cooking and restaurant management.

Plaintiff stated that "mental conditions" (AR 756) had prevented him from working since October 31, 2006, including difficulty concentrating and finishing tasks, and feeling overwhelmed. Plaintiff acknowledged a secondary diagnosis of alcohol dependence, but maintained that it was an issue "[i]n the past, but I don't believe it's an issue now, no." (AR 757.) He further stated that he did not believe his bipolar disorder had improved, characterizing it as an "up and down battle." (AR 763.) He testified that he visited Mr. Cote every four to six weeks and Ms. Lewis every two weeks for an hour at a time.

13

On an average day, Plaintiff testified that he compiles a list of goals but "never finish[es] anything" and becomes frustrated as a result. He stops and takes breaks, but upon returning to his chores feels overwhelmed and "go[es] to watch a movie or something and leave[s] everything right where it is." *Id.* While he used to enjoy working in a public setting, Plaintiff declared that he now "hate[s] people" (AR 769) and "can not accept the slightest change" that arises in his schedule (AR 770). Plaintiff reported experiencing bouts of anger for which he sought treatment.

### 2. October 15, 2010 Hearing Before ALJ Merrill.

Plaintiff testified that he applied to work at a restaurant after the initial adverse decision by ALJ Merrill but was not invited for an interview. For the previous fourteen months, Plaintiff testified that he continued to visit Ms. Lewis every two weeks, had thrown objects, and had trouble sleeping.

Plaintiff acknowledged that he "had a DWI" (AR 549) approximately twenty or twenty-five years previously and further admitted that during the prior spring he had been drinking heavily for several weeks. Upon seeing Dr. Wood, Plaintiff was advised to go to the Care Bed where he cut his wrists with a piece from a cribbage set. He remained under medical care for five days. In August 2010, he started to "scratch[]" his wrists with a knife "to practice for the real thing" and thought of suicide "[q]uite often." (AR 551.)

Plaintiff stated that in the morning he sees his kids off to school, makes his own breakfast, and takes his medicine. In the afternoon, Plaintiff takes a nap pursuant to Dr. Edelstein's advice that "the more sleep I got, the better off I'd be." (AR 554.) Plaintiff attended his son's soccer games, but did not attend other events involving his stepchildren in order to avoid crowds and reported that he did not socialize with friends.

### 3. April 4, 2013 Hearing Before ALJ Levin.

Plaintiff testified that he worked in a culinary position from December 2010 to February 2011 on an on-call basis. He explained that because this schedule was difficult and his hours were reduced, he terminated his employment. After he left that position, he found a more secure position in April 2011, working approximately eight hours per day two or three days per week as a cook. At some point thereafter, he was demoted to

working as a prep cook. During this period, Plaintiff stated he stopped seeing Ms. Lewis "because I was seeing her for a long time and it just seemed like the same repetitive, repetitive stuff." (AR 653.)

In early 2012, Plaintiff took another position at a restaurant where he worked two to four days per week, for an average of twenty hours per week. Later in 2012, Plaintiff was asked to assume the responsibilities of his boss, which led to a series of "absolutely horrible" panic attacks. (AR 656.) Between October 2010 and September 2012, Plaintiff stated that he consumed one or two beers, three or four nights per week. From September through November 2012, he acknowledged drinking "six plus beers a day" because he felt "depressed and under a lot more pressure and just basically couldn't handle what was going on." *Id.* Plaintiff stated that he had "not had a drop of alcohol" since November 25, 2012 when he consumed a large amount of Tylenol and was subsequently hospitalized. (AR 657.)

Plaintiff testified that he received inpatient treatment at Dartmouth-Hitchcock for approximately three weeks during which he received ECT and that he experienced "very few" memory problems as a result. (AR 658.) Plaintiff stated that he continued to visit Dr. Edelstein approximately once a month for fifteen to thirty minutes. In the several months after his release from Dartmouth-Hitchcock, Plaintiff spent his days "lounging around" for four to five hours watching television and listening to music, and helping his kids in the morning. (AR 661.) His wife handled the grocery shopping for the household.

### 4.    January 7, 2016 Hearing Before ALJ Levin.

At his fourth hearing, Plaintiff testified that he lived with his wife and three stepchildren. He continued to see Dr. Edelstein once a month, engaged in counseling every two weeks with a counselor at Northeast Kingdom Human Services since April 2013, and took prescribed Trazodone, Mirtazapine, Lamotrigine, Cymbalta, Wellbutrin, and Lithium.

Plaintiff stated that he had consumed alcohol on one occasion since his hospitalization in November 2012. He recounted teaching his son how to drive and

15

venturing onto a road that he did not realize was private, which prompted a verbal altercation with the property owners. Plaintiff consumed a six-pack of beer after this incident, which occurred sometime in October 2014.

Plaintiff testified that since he underwent ECT, he has experienced memory problems: "I can't really remember things like in a week, in a day. . . . I make lists, and then I forget them or lose them." (AR 603.) He described the feeling of having a "black cloud" descending over him that "blocks my eyes, and makes things worse." (AR 607.)

### III.    ALJ Levin's Application of the Five-Step, Sequential Evaluation Process.

In order to receive SSDI benefits, a claimant must be disabled on or before his or her date last insured. Social Security Administration ("SSA") regulations set forth the following five-step, sequential evaluation process to determine whether a claimant is disabled:

> (1) whether the claimant is currently engaged in substantial gainful activity;
> (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)). "The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden of proving his or her case at [S]teps [O]ne through [F]our of the sequential five-step framework established in the SSA regulations[.]" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotation marks and citation omitted). At Step Five, "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform." *McIntyre*, 758 F.3d at 150 (alterations in original) (internal quotation marks omitted).

In this case, ALJ Levin determined that Plaintiff's date last insured was December 31, 2013, and that Plaintiff had engaged in substantial gainful activity from April 2011

through November 2012. At Step Two, ALJ Levin found that Plaintiff had the following severe impairments: "bipolar disorder, anxiety disorder, and a history of alcohol abuse in partial remission[.]" (AR 1272.) ALJ Levin noted that the record also revealed the existence of physical conditions including diabetes mellitus, hypertension, intermittent headaches, gastrointestinal reflux disease, back pain, and carpal tunnel syndrome. However, in the absence of any claim Plaintiff's physical limitations were the basis of his disability claim, ALJ Levin did not proceed further.

At Step Three, ALJ Levin found that Plaintiff had moderate restrictions in social functioning and in maintaining concentration, persistence or pace, no restrictions in the activities of daily living, and that he had experienced one or two episodes of decompensation. As a result, ALJ Levin concluded that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of any listed impairment, as the listing criteria for bipolar disorder and anxiety disorder require at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation. (AR 1273.) At Step Four, he further concluded that Plaintiff had the RFC to:

> perform a full range of work at all exertional levels but with the following nonexertional limitations: he is limited to simple, unskilled work. He should avoid social interaction with the general public. He can perform brief and superficial social interaction with coworkers and supervisors, which is defined as a semi-isolated workstation with no close proximity to any other people and would require no collaborative work. He is able to maintain attention and concentration for two hour increments throughout an eight-hour workday and 40-hour workweek.

(AR 1274.) ALJ Levin considered all of Plaintiff's alleged symptoms and found "that [Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible[.]" (AR 1275.) Based on Plaintiff's RFC, ALJ Levin determined that Plaintiff was not capable of performing past relevant work.

17

At Step Five, based in part on VE LaFlamme's testimony, ALJ Levin determined that Plaintiff was capable of performing the duties of representative vocations such as price marker, laundry classifier, and janitor, and for this reason was not disabled.

## IV. Conclusions of Law and Analysis.

### A. Standard of Review.

In reviewing the Commissioner's decision, the court "'conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied.'" *Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013) (quoting *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Even if the court could draw different conclusions after an independent review of the record, the court must uphold the Commissioner's decision when it is supported by substantial evidence and when the proper legal principles have been applied. *See* 42 U.S.C. § 405(g).

### B. Whether ALJ Levin Misapplied the Treating Physician Rule.

Plaintiff contends that ALJ Levin misapplied the treating physician rule by failing to accord controlling weight to the opinions of Dr. Edelstein, which were corroborated by Ms. Lewis, Mr. Cote, and Dr. Wood. "[T]he [Social Security Administration] recognizes a treating physician rule of deference to the views of the physician who has engaged in the primary treatment of the claimant[.]" *Burgess*, 537 F.3d at 128 (internal quotation marks omitted). Under the treating physician rule, the opinions of treating physicians are "binding if . . . supported by medical evidence and not contradicted by substantial evidence in the record." *Selian*, 708 F.3d at 418. However, "[a] treating physician's statement that the claimant is disabled cannot itself be determinative." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

To weigh the opinion of a treating physician, an ALJ must consider, among other things, the length, frequency, nature, and extent of the treatment relationship; the

consistency of the opinion offered with the "record as a whole"; and whether the opinion is "of a specialist about medical issues related to his or her area of specialty[.]" 20 C.F.R. §§ 404.1527(c)(2), (4), (5) & 416.927(c)(2), (4), (5). An ALJ is "required either to give [the opinions of a claimant's treating physician] controlling weight or to provide good reasons for discounting them." *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010).

Plaintiff argues that ALJ Levin did not address the six factors enumerated in 20 C.F.R. § 404.1527(c) in evaluating Dr. Edelstein's opinions. While an ALJ must consider the § 404.1527(c) factors, he or she need not analyze each factor in order to properly evaluate a treating physician's opinion. *See Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2d Cir. 2004) (per curiam) (upholding decision where ALJ did not mention § 404.1527(c) factors but gave "good reasons" for his decision to afford little weight to a treating physician's opinion such that "the substance of the treating physician rule was not traversed"); *see also Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) ("[Plaintiff] challenges the ALJ's failure to review explicitly each factor provided in 20 C.F.R. § 404.1527(c). We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear.").

ALJ Levin afforded Dr. Edelstein's opinions "little" weight for five reasons. (AR 1280.) First, while Dr. Edelstein qualified as a treating physician, his opinions were internally inconsistent. Specifically, he opined in September 2010, March 2013, and December 2015 that Plaintiff could not work, but opined in September 2011 that Plaintiff could return to work nearly full-time. ALJ Levin accurately observed that Dr. Edelstein's latter two opinions did not address this discrepancy. *See Greathouse v. Colvin*, 2015 WL 418132, at *13 (D. Conn. Jan. 30, 2015) ("A physician's opinions are given less weight when his opinions are internally inconsistent.") (internal quotation marks omitted); *see also* 20 C.F.R. § 404.1527(c)(6) ("When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion.").

ALJ Levin further noted that of the four opinions, only Dr. Edelstein's final opinion rendered in December 2015 mentioned Plaintiff's alcohol use, thus "call[ing] into

19

question the reliability of these opinions and how comprehensively Dr. Edelstein considered the claimant's functioning." (AR 1278.) In light of Plaintiff's testimony acknowledging intermittent alcohol use that was excessive at times, ALJ Levin did not err in according less weight to Dr. Edelstein's opinions on this basis. *See Bus v. Astrue*, 2010 WL 1753287, at *5 (W.D.N.Y. Apr. 29, 2010) (holding that ALJ provided good reasons for not affording treating physician's opinion controlling weight, including that the opinion did not consider the claimant's drug abuse, "lacks objective support and flies in the face of other medical reports") (internal quotation marks omitted).

Second, ALJ Levin concluded that Dr. Edelstein's opinions were inconsistent with the record as a whole, including Plaintiff's eighteen months of work, and ability to perform household tasks and child care. As ALJ Levin observed, Dr. Edelstein's September 2010 opinion was "contradicted by [Plaintiff's] ability to work at levels of substantial gainful activity seven months later and continue this activity for the subsequent 18 months." (AR 1278-79.) Similarly, although Dr. Edelstein opined that Plaintiff suffered "marked" limitations in a number of areas, this opinion conflicts with his May and June 2010 treatment notes which describe Plaintiff as having a full range of affect, neutral mood, coherent speech, and as calm, friendly, and cooperative. ALJ Levin supported his conclusion with detailed and accurate citations to Dr. Edelstein's treatment notes during the course of his five-year treating relationship with Plaintiff.

Assessed in their totality, Dr. Edelstein's treatment notes, with few exceptions, described Plaintiff as having a "euthymic" or "calm" mood and a full range of affect through late 2012. (AR 1029-30, 1059, 1054.) While Dr. Edelstein recorded that Plaintiff was "downcast" in September 2011 after having a "rough month" (AR 1034), one month later he recorded that Plaintiff was working a nearly full-time schedule of thirty-five hours per week and had been "trying to keep up with a very large garden" (AR 1035). ALJ Levin concluded that this evidence was inconsistent with Dr. Edelstein's opinion that Plaintiff had marked limitations in his ability to function in a work setting and maintain concentration.

Third, ALJ Levin found Plaintiff's generally stable mood persisted after he had been hospitalized at Dartmouth-Hitchcock following a suicide attempt. Dr. Edelstein's notes revealed that Plaintiff had gone on a camping trip in the summer of 2014 and planned to go kayaking, activities which he found inconsistent with a mental disability that precludes work or participation in a training program. In the ensuing time period, Dr. Edelstein again documented Plaintiff's "euthymic" mood (AR 1235) and noted that Plaintiff was not reporting significant depressive symptoms. Because ALJ Levin identified numerous inconsistencies between Dr. Edelstein's opinion statements and his treatment notes over a five-year time frame, he did not err in finding Dr. Edelstein's opinions entitled to less weight. *See Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998) ("It is for the SSA, and not this court, to weigh the conflicting evidence in the record."); *see also* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").

Fourth, while ALJ Levin acknowledged that Dr. Edelstein had a "rather significant history with" Plaintiff (AR 1280), which lasted from May 2010 through at least December 28, 2015, he also noted that Dr. Edelstein first began to treat Plaintiff almost four years after Plaintiff's alleged onset date of disability. In this respect, the ALJ properly noted that Dr. Edelstein was not a treating physician for a significant portion of the relevant time period. *Cf.* 20 C.F.R. § 1527(c)(2)(i) ("When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight[.]").

Plaintiff contends that Dr. Edelstein's opinions are buttressed by the treatment notes and opinion statements by Mr. Cote, Ms. Lewis, and Dr. Wood from June 2006 to May 2010. However, these sources' opinions do not collectively or independently compel a finding of disability. As ALJ Levin pointed out, neither Mr. Cote nor Ms. Lewis is an acceptable medical source within the meaning of applicable SSA regulations. *See* SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006) (identifying nurse practitioners and therapists as "other sources"). ALJ Levin further determined that Mr. Cote's opinions ascribed no function-by-function limitations to Plaintiff and instead offered a

21

"conclusory finding of disability" (AR 1282) and that Ms. Lewis "provide[d] almost no analysis of the effect of alcohol on the claimant's mental condition" and even incorrectly stated in her Mental Assessment that Plaintiff's alcohol was "no longer an issue" as of October 10, 2010. (AR 1281.)

Although Plaintiff heavily relies upon Dr. Wood's February 16, 2007 treatment note "[a]gree[ing] with disability on a psychiatric basis" (AR 283), ALJ Levin observed that Dr. Wood made this comment very early in the relevant time period and performed no mental status examination or assessment of Plaintiff's abilities or limitations to support it. Moreover, a disability determination is reserved for the Commissioner. *See* 20 C.F.R. § 1527(d)(1) (providing that the SSA is "responsible for making the determination or decision about whether [the claimant] meet[s] the statutory definition of disability" and that "[a] statement by a medical source that [the claimant is] 'disabled' or 'unable to work' does not mean that [the SSA] will determine that [the claimant] is disabled").

ALJ Levin properly accorded "little" weight to Dr. Wood's opinion (AR 1282) for the further reason that he made his psychiatric diagnosis in apparent reliance on the opinions of Ms. Lewis and Mr. Cote. Dr. Wood is not a specialist in psychiatry and his opinion addresses none of the listing requirements for bipolar disorder. *See Williams v. Bowen*, 859 F.2d 255, 259 (2d Cir. 1988) (holding that "it is not sufficient that there be a diagnosis of a listed impairment" for a claimant to be entitled to SSDI benefits, but that "the evidence must also establish that the medical findings demonstrate the existence of the specific impairment").

Because ALJ Levin supplied good reasons for according little weight to the opinions of Mr. Cote, Ms. Lewis, and Dr. Wood, the purported consistency of those opinions with those offered by Dr. Edelstein did not undercut his rationale for according Dr. Edelstein's opinions little weight.

Finally, ALJ Levin concluded that Dr. Edelstein's opinions were inconsistent with those of Dr. Ruggiano which he accorded "great" weight. (AR 1277, 1283.)[2] Plaintiff argues that ALJ Levin's decision to accord great weight to Dr. Ruggiano's opinions rested on a misinterpretation of Dr. Ruggiano's testimony. In particular, Plaintiff criticizes ALJ Levin's statement that "Dr. Ruggiano testified . . . that [ECT] is not necessarily reserved for those with the most severe mental conditions, but rather is used when medications have historically not been effective." (AR 1277-78.) Plaintiff concedes that "[t]he ALJ was correct [that] ECT *is* used when medications fail[]" but disputes that Dr. Ruggiano testified that ECT is not reserved for the most severe mental conditions. (Doc. 8-1 at 8.)

An examination of the January 7, 2016 hearing transcript reveals that Dr. Ruggiano admitted that it was "fair to say" that ECT is reserved for the "more severe or intractable cases of depression" and that providers "save it for cases that don't respond to medications." (AR 626.) He, however, further opined that, but for the stigma attached to it, ECT would be used more readily. Accordingly, while ALJ Levin may have failed to fully and accurately reflect Dr. Ruggiano's testimony regarding ECT, it also remains true that Dr. Ruggiano opined that ECT did not necessarily indicate that the patient suffers from an extreme or intractable mental impairment. Indeed, Plaintiff was released to return to work shortly after he completed ECT. *See* AR 1084 (Dartmouth-Hitchcock discharge summary recording that "it may be beneficial for [Plaintiff] to take a short leave from work until he could effectively manage the stress" and that Plaintiff "agreed that it would be better for him if he were to return after the New Year"). As a result, Dr.

---

[2] "In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources." SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996). Provided that the non-examining sources' opinions "are supported by evidence in the record[,]" the ALJ may "permit the opinions of nonexamining sources to override treating sources' opinions[.]" *Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995) (citing *Schisler v. Sullivan*, 3 F.3d 563, 567-68 (2d Cir. 1993)); *see also Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983) ("[T]he opinion of a treating physician is not binding if it is contradicted by substantial evidence, and the report of a consultative physician may constitute such evidence.") (citation omitted).

Ruggiano's testimony supported ALJ Levin's conclusion that "[t]he fact that [Plaintiff] underwent electro-convulsive therapy is a factor in the overall analysis but does not by itself reflect a need for limitations in excess of those identified." (AR 1278.)

To the extent Plaintiff contends that any reliance on Dr. Ruggiano's testimony was misplaced, ALJ Levin provided good reasons for reaching a contrary conclusion. He acknowledged the absence of a treating relationship but pointed out that Dr. Ruggiano is board certified in psychiatry and neurology and is familiar with SSA rules and regulations. He also noted that Dr. Ruggiano reviewed the medical record in its entirety and rendered an assessment of Plaintiff's abilities that was consistent with his symptom presentation, in contrast to the opinions of Dr. Edelstein, Ms. Lewis and Mr. Cote.

Based on the foregoing, ALJ Levin supplied at least five good reasons not to afford Dr. Edelstein's opinions controlling weight under the treating physician rule: (1) Dr. Edelstein's opinions were internally inconsistent and failed to adequately address Plaintiff's alcohol use; (2) his opinions were inconsistent with Plaintiff's demonstrated ability to work during the 2011-12 time period; (3) his opinions were inconsistent with his treatment notes documenting Plaintiff's generally mild symptoms; (4) his treating relationship with Plaintiff began relatively late in the relevant time period; and (5) his opinions were contradicted by the well-supported opinions of Dr. Ruggiano. Although a close question, in light of ALJ Levin's "good reasons," the treating physician rule was not traversed even if this court might have reached a different conclusion. *See Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984) ("The court may not substitute its own judgment for that of the Secretary, even if it might justifiably have reached a different result upon a de novo review."); *see also Stolpen v. Astrue*, 2009 WL 1505524, at *1 (D. Conn. Mar. 24, 2009) (noting that "a court may not decide facts, re-weigh evidence or substitute its judgment for that of the Commissioner" and that "[u]nder this standard of review, absent an error of law, a court must uphold the Commissioner's decision if it is supported by substantial evidence, even if the court might have ruled differently").

## C. Whether ALJ Levin Properly Evaluated the Evidence Regarding Plaintiff's Alcohol Use.

The Social Security Act provides that "[a]n individual shall not be considered . . . disabled . . . if alcoholism or drug addiction would (but for [certain exceptions]) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). Applicable regulations provide: "[i]f we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability." 20 C.F.R. § 404.1535(a). The "key factor" in this inquiry is "whether [the Commissioner] would still find [the claimant] disabled if [he or she] stopped using drugs or alcohol." *Id.* § 1535(b)(1). The Second Circuit has held that the claimant bears the burden of demonstrating that his or her drug addiction or alcoholism is not material to the disability determination. *See Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 120 (2d Cir. 2012) (holding that claimants "bear the burden of proving that they would be disabled in the absence of [drug addiction or alcoholism]").

In his April 9, 2013 decision, ALJ Levin found that:

[Plaintiff's] substance use disorder is a contributing factor material to the determination of disability because the claimant would not be disabled if he stopped the substance abuse[.] Because the substance use disorder is a contributing factor material to the determination of disability, the claimant has not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of this decision.

(AR 727.) The Appeals Council subsequently remanded the case to ALJ Levin on a number of grounds, including its observation that "while the administrative record includes evidence of alcohol abuse for portions of the period at issue, the record does not conclusively establish that the claimant abused alcohol for the entire period at issue." (AR 742.) The Appeals Council directed ALJ Levin to "[o]btain evidence from a new medical expert (preferably a board-certified psychiatrist) to clarify the nature and severity of the claimant's impairment . . . and to assist in determining whether substance abuse is a contributing factor material to a finding of disability." (AR 744.) In the decision under review, ALJ Levin concluded that "[u]pon further consideration of the evidence of record

in its totality and giving great weight to the opinion of Dr. Ruggiano, I find that alcohol abuse is not material to the determination" of disability. (AR 1276.)

Plaintiff contends that despite ALJ Levin's finding that Plaintiff's alcohol use was not material, the ALJ's decision is nevertheless premised on an unfounded assumption that Plaintiff engaged in significant alcohol use during the period under review.[3] Specifically, Plaintiff challenges ALJ Levin's statement that "Dr. Ruggiano testified that the claimant does have a history of significant alcohol use" (AR 1276), noting it is an inaccurate paraphrase of Dr. Ruggiano's testimony. Dr. Ruggiano testified that "I don't even know how much alcohol [Plaintiff is] using" but "I read these treating notes, and it makes me think there's an alcohol problem here, but I can't say with reasonable certainty because he's denying it[.]" (AR 621.) Although the ALJ failed to accurately summarize this testimony, the thrust of his conclusion was that Plaintiff's medical sources did not adequately address his alcohol use in rendering their opinions and that Dr. Ruggiano disagreed with Dr. Edelstein's opinion that alcohol was not the "primary causative factor in [Plaintiff's] illness" (AR 621) and instead opined that Plaintiff may have been using central nervous system depressants, which include alcohol.[4] This is a fair characterization of the record. Moreover, as it was only one of several reasons why ALJ Levin accorded Plaintiff's treatment providers' opinions little weight, ALJ Levin's failure to accurately summarize the entirety of Dr. Ruggiano's testimony regarding Plaintiff's alcohol use is not grounds for remand.

---

[3] Plaintiff argues in his motion to reverse that "the ALJ's opinion is quite confusing, self-contradictory and misleading on the question of alcohol use" (Doc. 8-1 at 8) and that "[w]hat seems to be going on here is the ALJ wants to thread a needle: he is bootstrapping Dr. Ruggiano's speculation about alcohol to a higher level without always acknowledging that he is doing so." *Id.* at 13.

[4] Plaintiff further argues that ALJ Levin was required to consider whether Plaintiff's prescribed use of Benzodiazepine may have caused his symptoms, citing Dr. Ruggiano's testimony that Benzodiazepine constituted a "central nervous system depressant" that could diminish Plaintiff's "frustration tolerance." (AR 614.) Had ALJ Levin done so, however, there is no evidence that his conclusion would have been different. The thrust of Dr. Ruggiano's opinion was that symptoms of irritability remit in bipolar disorder while Plaintiff's irritability remained relatively constant even when addressed by medication. Plaintiff does not attribute his frustration to his use of Benzodiazepine and provided no grounds for ALJ Levin to do so.

ALJ Levin credited Dr. Ruggiano's testimony because he found that it was consistent with the record as a whole and reasonably called into question whether Plaintiff's periodic and potentially understated use of alcohol was overlooked by Dr. Edelstein in his bipolar diagnosis. Against this backdrop, ALJ Levin's treatment of Plaintiff's alcohol use was not reversible error. *See Sova v. Colvin*, 2014 WL 4744675, at *9 (N.D.N.Y. Sept. 23, 2014) (holding that because the ALJ's finding was "supported by substantial evidence other than the statement in question, reconsideration on remand would not likely result in a different outcome, and therefore the error is harmless").

## D. Whether ALJ Levin's Credibility Determination Was Supported by Substantial Evidence.

Plaintiff argues that his credibility was improperly assessed by ALJ Levin because his "strong work history is entitled to substantial credibility" and "[h]is complaints were consistent." (Doc. 8-1 at 14-15.) SSA regulations provide that "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996). In rendering a credibility assessment, the ALJ "must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances" and consider whether those statements are consistent with "reports and observations by other persons concerning the individual's daily activities, behavior, and efforts to work." *Id.* at *5-6.

Credibility determinations are reserved for the ALJ and the court may not substitute its own judgment for that of the Commissioner. *See Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner."); *Aponte v. Sec'y, Dep't of Health & Human Servs. of U.S.*, 728 F.2d 588, 591 (2d Cir. 1984) ("It is the function of the [Commissioner], not the reviewing courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses.") (internal quotation marks omitted).

Here, ALJ Levin documented a series of inconsistencies between Plaintiff's claims of disabling mental impairments and the reports and observations of his treating sources regarding the extent of Plaintiff's daily activities. ALJ Levin found that Plaintiff's claims were "[m]ost convincingly" contradicted by his eighteen months of continuous employment in the culinary field. (AR 1277.)[5] He further noted that Plaintiff's ability to perform household chores and pursue hobbies which included gardening, woodworking, and home repairs, and activities such as camping and kayaking were inconsistent with the limitations Plaintiff claimed. Inconsistencies in Plaintiff's self-reports during the relevant time period buttress this conclusion. Plaintiff testified at his January 7, 2016 hearing that he experienced memory loss following his ECT in December 2012, but claimed very little memory loss at the April 4, 2013 hearing, and contemporaneous treatment notes record that Plaintiff had an intact memory in the period following his ECT treatment. ALJ Levin also properly found that Plaintiff's complaints of near complete debilitation were inconsistent with the treatment notes of his health care providers, which "do not describe the claimant as presenting with abnormalities or deficits consistent with the extent and frequency of symptoms he described." (AR 1276.)

Although Plaintiff's work history militates in favor of finding his complaints credible, *see Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983) (noting that "[a] claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability"), a claimant's work history is "just one of many factors that the ALJ is instructed to consider in weighing the credibility of claimant testimony." *Schaal*, 134 F.3d at 502. In this case, ALJ Levin considered Plaintiff's work history and nonetheless found that Plaintiff was not entirely credible. Because substantial evidence supports ALJ Levin's credibility determination, the court cannot reject it merely

---

[5] SSA regulations provide that during a "trial work period" a claimant "may test [his or her] ability to work and still be disabled." 20 C.F.R. § 404.1592(a). As the Commissioner argues, Plaintiff's characterization of this eighteen-month period as a trial work period is misplaced because a trial work period can last "as many as 9 months[.]" *Id.* ALJ Levin was therefore not required to regard Plaintiff's return to work from April 2011 to November 2012 as a trial work period.

28

because it might have reached a different conclusion. *See Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) ("Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence.") (internal quotation marks omitted).

In summary, although this case presents a close question, and although in a *de novo* review this court might reach a different conclusion, Plaintiff has not established that the ALJ's decision is not supported by substantial evidence or that the ALJ misapplied applicable legal standards in such a manner as to constitute reversible error. In such circumstances, the Commissioner's motion to affirm must be granted. *See Shaw v. Carter*, 221 F.3d 126, 131 (2d Cir. 2000) ("A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error.").

## CONCLUSION

For the foregoing reasons, the court DENIES Plaintiff's motion for an Order reversing the Commissioner's decision (Doc. 8) and GRANTS the Commissioner's motion to affirm (Doc. 11).

SO ORDERED.

Dated at Burlington, in the District of Vermont, this *10*th day of April, 2017.

Christina Reiss, Chief Judge
United States District Court